Reynolds Metal Company *v.* Robbins.

5-1921 328 S. W. 2d 489

Opinion delivered November 9, 1959.

*Wooten, Land & Matthews,* for appellant.

*McMath, Leatherman & Woods* and *James E. Young-dahl,* for appellee.

Carleton Harris, Chief Justice. This appeal relates to the action of the Workmens Compensation Commission in awarding compensation to Vera Love Robbins, widow, and Mary Catherine Robbins, minor child of Joe Jack Robbins, deceased. Robbins died as a result of a heart attack, suffered at the Jones Mill plant of Reynolds Metals Company on the night of July 4, 1957 (death occurred about 1:30 a.m., July 5). By a 2-1 vote, the Commission found the claim compensable, and made an award for the benefit of the widow and minor child in accordance with the provision of the compensation law. On appeal, the award was affirmed by the Circuit Court of Hot Spring County, which entered its judgment in accordance therewith. From such judgment, appellants bring this appeal.

The facts, in brief, are as follows. Robbins, an electric cellman for appellants, arrived home from work on July 4, 1957, about 8:45 a. m. He went to bed about 9:30 a. m., remaining there until suppertime about 5 p. m., thereafter returning to bed until approximately 10 p. m., at which time he arose, had coffee, and left for his work about 10:45 p. m. According to Mrs. Robbins, her husband had never had any trouble with his heart before, and had never complained of pains in his chest. The evidence showed that Robbins arrived at the gate of the plant around 11:30, and walked from there to the bath house with a fellow employee, Fay Gnau, for the purpose of changing his clothes. Nothing was said to Gnau to indicate that he was not feeling well. He then reported to his post of duty in Section 14 of the pot line[1] about five minutes before 12. The "graveyard" shift, to which Robbins had just recently been transferred (this was the third night he had worked on this particular shift), commenced at midnight. The testimony reflected that before commencing actual work, Robbins remarked to a fellow worker, John Vaughn, that he felt pretty bad; that he had a choking sensation in his chest; **"said it** seemed like he couldn't get his good breath"; that he was "awful white". Vaughn testified that he helped Robbins put out one light on a pot.[2] About 12:15 a. m., fellow employees talked Robbins into going to First Aid, and he reluctantly agreed to go. Robbins returned from First Aid around 1:30, and told fellow employees that he felt no better. When asked if he had been given anything at First Aid, he replied, "Well, they gave me a dose of soda." Deo Henderson, who worked in an adjoining section, suggested that Robbins go home, but the latter replied he would like to "stay and make the double time at night". Robbins then proceeded to knock

---

[1] His duties required him to attend electric smelting pots.

[2] This was a two or three minutes operation, which involved pushing a weighted rake, about 12 or 14 feet long, weighing approximately 100 pounds, back and forth on rollers, along the length of the pot to break down the crust of aluminum ore which formed on the top. Electric charges are passed through carbon along the bottoms and sides of the pot (or vat) creating high temperatures and transforming the ore into a molten mass.

down two pots,[3] *i.e.*, breaking up the crusts, an operation which, according to witness Vaughn, took "maybe five minutes or a little longer". After breaking down the second pot, he hung up his rake, turned, made two steps, and collapsed. It appeared to witnesses that he was headed in the direction of a curtain wall, from which ventilation came. Death was practically instantaneous. An autopsy was performed, which disclosed an occlusion of the posterior coronary artery.

Appellants contend "there was not substantial testimony sufficient to sustain the award of the Commission", and that the judgment of the Circuit Court should be reversed, and the case dismissed.

Appellants point out that Robbins' work on the morning of his death consisted of his usual and ordinary duties, and that he engaged in no unusual strain or overtaxing work. In one of our earlier heart cases, *McGregor and Pickett* v. *Arrington*, 206 Ark. 921, 175 S. W. 2d 210, the widow and children of H. L. Arrington, who died while engaged in his employment as a carpenter, were given an award by the Compensation Commission. At the time of his death, Arrington was engaged in sliding a plank into place. He suddenly slumped, and was dead by the time his body could be lowered from the scaffolding, where he was at work, to the ground. Arrington was engaged in the ordinary duties of a carpenter at the time. This Court affirmed the award. The holding seems to have been somewhat qualified by later decisions, typified by *Baker* v. *Slaughter*, 220 Ark. 325, 248 S. W. 2d 106. In that case, compensation was denied by the Commission, a finding reversed by the Circuit Court, but this Court reversed the trial court with directions to affirm the Commission, which had found that Slaughter was only pursuing in the normal and usual way, the work he had been performing for some time. However, the inconsistencies of these and other cases were settled

---

[3] According to the evidence, a pot is a long vat, around 20 or 22 feet long, with a row of carbon on either side. The vat contains a bath of the general materials that are used in converting alumina into aluminum. A very high heat is maintained in the bath, and the alumina is poured over the top, and during the course of the process, it will sometimes crust over. The rake is used to break down the crust of ore.

by the case of *Bryant Stave & Heading Co.* v. *White,* 227 Ark. 147, 296 S. W. 2d 436, wherein we re-affirmed the rule set out in the *McGregor* and similar cases, including *Harding Glass Company* v. *Albertson,* 208 Ark. 866, 187 S. W. 2d 961, wherein it was said:

"While appellants cite authorities holding to the contrary, we think the better rule, and the one supported by the great weight of authority is that a heat prostration which resulted as here, and was sustained by a workman or employee, while engaged in the employment, and which grew out of the employment, whether due to unusual or extraordinary conditions or not, is deemed an accidental injury and compensable, and we so hold."

Further, in that case, quoting from Schneider, Workmen's Compensation Text, Sec. 1328:

"The majority of the American courts follow the English rule as set out in the case of *Clover, Clayton & Co.* v. *Hughes* (1910), A. C. 242: 'An accident arises out of the employment when the required exertion producing the accident is too great for the man undertaking the work, whatever the degree of exertion or condition of health.' "

The *Bryant* opinion then concluded with this language:

"Notwithstanding anything we may have said in prior cases, we hold that an accidental injury arises out of the employment when the required exertion producing the injury is too great for the person undertaking the work, whatever the degree of exertion or the condition of his health, provided the exertion is either the sole or a contributing cause of the injury. In short, that an injury is accidental when either the cause or result is unexpected or accidental, although the work being done is usual or ordinary."

Accordingly, the fact that Robbins was only engaged in his ordinary and usual duties at the time of his death does not bar a recovery.

The unusual part of this case relates to the fact that Robbins' heart attack admittedly had commenced before he had actually performed any labor. The question therefore before this Court, is whether there was substantial evidence to show that Robbins' condition was aggravated by the work performed, as heretofore set out; or stated differently, whether his death occurred sooner than would have otherwise occurred if the work had not been performed. That is the rule as stated in *Frank Lyon Co.* v. *Scott*, 215 Ark. 274, 220 S. W. 2d 128, and *Quality Excelsior Co.* v. *Maestri*, 215 Ark. 501, 221 S. W. 2d 38. It is true that in those cases the deceased had already performed some labor before the heart attack occurred,[4] but we see no material difference *if the labor performed hastened the death*. The Commission, in its opinion, stated:

"Let us now turn to a consideration of that portion of the evidence which describes the work performed by the deceased and the conditions under which that work was done. An electric cell man attends a smelting pot used in processing alumina. Heat generated by electricity is conducted through the pot and thus transforms ore placed into the pot into a molten mass. A crust frequently forms atop this molten mass and it is one of the duties of a cell man to break or dissolve this crust. In so doing, the cell man runs a metal rake weighing approximately 100#, and resting upon rollers, back and forth across the pot. This process is called "breaking down a pot". After breaking down a pot, the cell man removes the rake and places it in a fastening device located alongside the pot. Deceased had just completed the task of breaking down a pot and had placed the rake at its assigned resting place when he fell and died. As for conditions at the plant at the time, witnesses herein testify that the weather was hot. The Weather Bureau reports, admitted to the record herein, reflect that the temperature in Little Rock at 1:00 a. m., on July 5, 1957, was slightly in excess of 80 degrees. We take judi-

---

[4] Of course, it is most unusual, as in the instant case, for one to continue work after a heart attack has commenced, and cases of this nature would be extremely rare.

cial notice that Little Rock is only some 45 miles distant from Jones Mill. * * * The temperature at the site of the smelting pots where deceased was working is described as being in excess of outside temperatures by some 15 degrees.''

There is quite a bit of evidence relative to the heat.[5] Witness Vaughn stated that it was much hotter inside than outside, and much hotter close to the pot than away from it . . . Witness Deo Henderson testified that many of the men, including Robbins, wore ''long handled'' underwear, as a means of protection . . . R. O. Carpenter testified that the temperature inside was at least 20 or 30 degrees hotter than outside . . . Ernest Cassidy estimated the temperature around the pots that particular night to be from 110 to 120 degrees. ''You can get up on the pot, and it will scorch your clothes if you stay there.'' We have several times noted the influence of heat on heart attacks. See *McGregor & Pickett* v. *Arrington, supra, Harding Glass Co.* v. *Albertson, supra,* and *Tri-State Construction Co.* v. *Worthen,* 224 Ark. 418, 274 S. W. 2d 352.

However, in addition to the heat angle, we think the medical testimony of the two doctors who testified, supplied evidence of a substantial nature in support of the award. Dr. Howard Dishongh and Dr. Drew F. Agar, both of Little Rock, testified, and each stated that he was of the opinion that Robbins' work did not cause the heart attack. Dr. Dishongh testified[6] that when Robbins complained of the indigestion and choking sensation, the acute attack had already begun. From his testimony:

''I would be foolish to state that the cause of that man's coronary occlusion was his work. I feel that it could have happened in bed as well as at work, but I do feel that perhaps it was aggravated by the fact, first,

---

[5] Actually, the Weather Bureau report reflects that the temperature in Little Rock on July 5, 1957, at 1:00 a.m., was 82 degrees, which was the hottest 1:00 a.m. temperature recorded during the entire month of July.

[6] The doctor stated that, from the autopsy, Robbins suffered from ''a hardening of the artery, and no doubt that had been developing for years rather than for weeks'', and the attack resulted from a hardening of the arteries rather than a thrombosis.

that he had to walk to the rest room. I have been told it took approximately ten minutes to get there. That didn't do him any good after he had the pain. Q. You mean the first aid, Doctor? A. The first aid, I mean. The heat could have been a precipitating factor. Now, I am not saying that his work caused this coronary occlusion, but I can say that it aggravated a pre-existing condition, and it could have been that if he hadn't had that extra work to have done, he might have survived the attack.''

The Doctor testified that one who suffers a coronary occlusion should be immediately placed in bed, and that any exertion would aggravate the condition . . . that the heart tends to work faster when one is walking or taking physical exercise, and there is thereby a greater demand on the coronary artery. In answer to the question, ''Wouldn't it be your present thought that his work in that heat would have aggravated his pre-existing condition? A. A pre-existing condition? Yes.'' Further, ''Q. Doctor, when a man has a coronary occlusion as this man had, if he is completely immobilized, if he is diagnosed and completely immobilized immediately when the attack becomes acute, wouldn't you say that that man would have a far better chance of surviving than if the man went ahead and performed some physical exertion? A. There is no question about that, yes. That is absolutely a fact.'' On direct examination, Dr. Agar, who testified at the instance of appellants, stated that in his opinion, Robbins' work did not cause his death; however, on cross-examination, the doctor stated that the most widely used treatment for people suffering heart attacks is to immobilize the patient, preferably bed rest. In response to a question as to whether the heat and work would contribute to the severity of a heart attack which had already commenced, Dr. Agar replied:

''* * * first, I don't think the heat would affect it. Heat *per se,* but if we are to accept our theory that the best treatment is bed rest or inactivity as much as possible, after a heart attack has begun, then we would have to say that yes, that an exertion might have aggra-

vated it, providing it had already begun. If we are to accept our first premise that bed rest is treatment, we would have to follow along with that. * * * Q. Providing it had already begun, it would aggravate it? A. Oh, yes.''

Further:

''Q. So, if this man, once the attack had begun, if he had been immobilized and if he had immediately been taken to a hospital and given oxygen, wouldn't you say the man would have had a better chance of survival? A. I think you would have to say that, yes, although he could have gone on regardless of the treatment.''

Still further:

''* * * In the usual case, if a man begins to have a heart attack, wouldn't you say that exertion would hasten his death? A. I think — well, it would aggravate the condition. Now, whether it would hasten his death I don't know. I don't know if he is going to die or not. Q. Well, if it aggravated his condition that certainly would be likely to hasten his death, would it not? A. I think you would have to say that, yes.''

While neither doctor stated that Robbins would have lived if he had not continued with his work after the attack commenced, contrariwise, neither doctor stated that he would have died just as quickly if the work had not been performed.

Of course, the law in this state is that workmen's compensation cases shall be broadly and liberally construed, and that doubtful cases shall be resolved in favor of the claimant. *Boyd Excelsior Co.* v. *McKown*, 226 Ark. 174, 288 S. W. 2d 614. But there is even a stronger rule, namely, our oft repeated holding that if there is any substantial evidence to support the findings of the Commission, we will not disturb such findings. This is the strongest rule in compensation cases, and the one carrying the greatest weight. We are of the view that the testimony herein set out was sufficient to justify the Commission in reaching its conclusions, and the judg-

ment of the Circuit Court upholding the award is hereby affirmed.