U. S. Fidelity & Guaranty Co. *v.* Dorman.

5-2152                                                340 S. W. 2d 266

Opinion delivered November 21, 1960.

[redacted]

*Dickson, Putman & Millwee,* for appellant.

*Rex W. Perkins* and *Charles Bass Trumbo,* for appellee.

Carleton Harris, Chief Justice. This appeal relates to an award made by the Workmen's Compensation Commission for the benefit of Mrs. Doris Dorman, widow of Oscar L. Dorman, and four minor children. Following the award, appellants appealed to the Washington County Circuit Court. The court confirmed the award, and from such order of the court, appellants bring this appeal. Appellants rely upon only one point for reversal, *viz,* "It is medically unsound to permit the finding of a causal relationship between effort and myocardial infarction

unless the attack follows an episode of severe and unusual exertion."

Dorman, age 35, a carpenter by trade, suffered a heart attack that was described as a myocardial infarction on September 9, 1958, while engaged in carpentry work for his employer, Box Construction Company, during the construction of a residence at Fayetteville. The evidence reflected that Dorman first suffered a heart attack in the middle of July, 1957, and was hospitalized in the Veterans Administration Hospital from that time until August 13th, at which time he was released. During October and November of the same year, he worked as a night watchman during the construction of a factory in Fayetteville, and had no other employment until May 7, 1958, when he returned to work for Box Construction Company at his usual occupation of carpentry. During the period between May 7th and September 9th, Dorman suffered intermittent chest pains, which were relieved by rest or the taking of nitroglycerin tablets. According to Mrs. Dorman, her husband complained of pain anytime he exerted himself, and, after returning to work for the construction company, would make complaints of chest pains following his engaging in lifting or heavy work. She stated that the pains were worse the last day or two before the attack on September 9th. Following this last attack, which occurred about 3:30 in the afternoon, Dorman went to Dr. Joe Hall, of Fayetteville, and obtained an examination; he then went home, ate very little supper, and retired. Around midnight, the pains became more severe, and Mrs. Dorman took him in their car to the Veterans Hospital. According to her testimony, he lost consciousness before they arrived, and vomited after entering the hospital; death occurred less than 48 hours later.

Lloyd Box, employer of Dorman, testified that Dorman worked a forty hour week from May 7, 1958, until September 9th, and was doing general carpentry work. Since he (Box) had knowledge of the previous heart attacks, an effort was made to see that Dorman obtained lighter duties, and he heard no complaints from Dorman concerning chest pains during this four months

of employment. Box was working with Dorman on the morning of the 9th, being engaged in constructing the ceiling on the porch. The witness stated that this first required sawing, and that construction of the ceiling required Dorman to stand with his arms overhead. About 10:30 in the morning, Dorman complained that he was having a dizzy spell, "had pain up kinda high in his chest", but they continued to work on the ceiling since but little complaint was made. Thirty minutes was taken off for lunch, and at 12:30 the two men resumed work. Some complaint was made during the early part of the afternoon, but about 3:30, while Dorman was nailing the ceiling, the pain became more severe, and Box advised Dorman to go to the doctor. The witness stated that he did not consider the work on that day as particularly strenuous, though he stated that nailing a ceiling is as hard work as a carpenter is required to perform, with the possible exception of lifting or building a scaffold.

Three carpenters, Orville Foster, Arthur Ledford, and Carl Lewis, testified on behalf of claimant. Foster testified that reaching up over one's head and nailing is "most strenuous", and is the most strenuous part of carpentry work. Ledford, a carpenter of fifteeen years, testified that because construction of the ceiling requires overhead work, and requires the body to be out of its normal position, it places a strain on the worker, and "hurts me worse" than other phases of carpentry. Lewis likewise testified that overhead nailing or plastering of ceilings was the most difficult type of work to him, and produced the most strain upon his body.

Dr. Joe B. Hall of Fayetteville, specializing in internal medicine, testified that he saw Dorman on September 9th around 5:30 in the afternoon; that this was past the regular office hours, but the nurses recognized that Dorman was ill, and asked the doctor to see him. The witness stated that he obtained a history from Dorman, in which the facts heretofore set out were related, and that Dorman was having pain in the chest at the time of the interview. Dr. Hall testified that after making an examination and taking a cardiogram, he was of the opinion that

Dorman was having a myocardial infarction.[1] The doctor then stated, that based on the history, and his examination of the patient, "I think that the work he was doing was an aggravating factor which precipitated the heart attack." On cross-examination, the witness reiterated that the effort in which Dorman was engaged contributed to his death. Dr. Hall had no opinion, as to the immediate mechanism which brought about the formation of the thrombus, and stated that some mechanisms that precipitate thrombi have no relation to effort. He also testified, on cross-examination, that the effort could have contributed to Dorman's condition, even though there was no thrombus.

"The effort might have produced a subendomal hemorrhage. It might have produced a loosening of an arteriosclerotic plaque. It might have produced a narrowing of a coronary vessel which resulted in a myocardial infarction, without a thrombosis."

The doctor admitted that an occlusion of the artery could occur simply by degeneration of the artery in the arteriosclerotic process, and in such event, effort would have nothing to do with the attack. Dr. Hall stated that in many instances, acute myocardial infarction occurs without relation to effort, but in this instance, he considered the work Dorman was doing to be an aggravating factor which precipitated the heart attack.

Dr. W. J. Butt, upon being interrogated with a hypothetical question embracing the facts of the case, stated, that in his opinion, there was a direct causal relationship between the work in which Dorman was engaged and his heart attack. Dr. Butt stated there was no way of determining the cause of occlusion of the artery without an autopsy being performed (which had not been done), and

[1] Dr. Hall explained a myocardial infarction as follows: "Well, that implies that there has been a coronary thrombosis in the vast majority of cases; that there is disease of the coronary arteries in the form of arteriosclerosis which produces a narrowing of these arteries, and that this, combined with spasm or the rupture from the surface of one of these vessels or one of the sclerotic plaques precipitates a blood clot which shuts off the blood supply to a portion of the heart muscle, resulting in the death of this muscle and the death of this muscle is called a myocardial infarction."

he accordingly could not give the specific reason for the attack.

The doctor stated that it was normally his policy to order heart patients to bed for absolute rest, and that he had never recommended that a heart patient exercise when first suffering a coronary thrombosis.

Dr. Frank Riggall, in response to a hypothetical question, expressed the opinion that effort plays no part in the end result of the decay and degeneration of the coronary supply resulting in myocardial infarction, and was therefore of the opinion that there was no causal relationship between Dorman's actions as a carpenter, nailing on the ceiling, and his death. Dr. Riggall explained that there are five mechanisms that occasion the blocking or closing of the arteries. One of the five, according to the doctor, is coronary thrombosis, which Dr. Riggall stated is the most common, and he explained,

"* * * due to a further lack of nourishment there is further decay and further degeneration and the surface of the plaque becomes roughened. It is dying but not dead. That allows the cells in the traveling blood to be arrested on that roughened surface — to pile up — slowly in some cases, moderately fast in another, rapid in another, so that a thrombus is formed at the site of the roughened plaque. We call that coronary thrombosis. It may pile up sufficiently there to block the artery or it may not block the artery but a piece of it breaks off, again as an embolus, and blocks the artery lower down so as to deprive the heart muscle of its nourishment and produce infarction." Upon being asked whether effort plays any significant part in the two processes mentioned, he replied, "They are perfectly normal, natural processes of decay and degeneration in the particular plaque." The witness stated that he had made a survey of the cardiovascular cases in Elizabeth Hospital over the last twenty years. According to the doctor:

"Three of our cases were between 30 and 40. Two of them died in the acute attack, one of them died in a second attack. One of them was riding in a car in Fort

Smith which was being driven by his wife down Garrison Avenue in the middle of a block when he had his attack. Another occurred while he was shopping in Fayetteville and the third one occurred while he was shaving in his own bathroom. On the other cases of 230 it works out roughly that one-half of them were at rest, one-fourth of them, roughly, were at their usual vocation, and one-fourth of them appeared to be doing something unusual for them at that particular time. In three-quarters of them we could find no relation to activity; one-quarter doubtful.''

He also testified relative to other surveys which had been made in various parts of the country,[2] and stated that these surveys had,

''* * * changed all of our ideas, really, on treatment, although we are in a somewhat difficult position. I was taught, as I said, the classical view. I still with some fear and trembling hesitate to tell a man to resume activity * * *. Where we used to keep our heart patients in bed recumbent, flat, we get them up quicker, and we have them sit up because we know more about the effects of the circulation. When a man is sitting up in bed or is standing up, the heart only has to pump the blood to the arch of the aorta. From there on it falls by gravity. When he is lying in bed the heart has to pump it along the level. Those are some of the things that these newer ideas have given us in handling these cases.''

Dr. Riggall testified that surveys in Utah, Washington, and California, indicated no relationship between effort and myocardial infarction; however, he admitted that there is a wide divergence of views on the subject.

Dr. Spencer Brown, in response to a hypothetical question embracing the facts of this case, was of the

---

[2] According to Dr. Riggall, a survey conducted by medical authorities in New York revealed that of 398 internists and cardiologists, 93.9% agreed that work did not produce heart disease; 93.4% agreed that atherosclerosis of the coronary arteries must exist before there can be an infarction of heart tissue; 88.5% were of the view that ordinary or moderately heavy work does not produce coronary effects, and 88.9% thought that later heart attacks were due to the natural progression of coronary arteriosclerosis, and not related to previous attacks.

opinion that Dorman's exertion had nothing to do with the heart attack. The doctor stated that exertion will not precipitate an acute coronary insufficiency in a person whose arteries are already diseased, because the insufficiency is already present, and the exertion only makes it manifest. He stated that any unusual exertion beyond the person's limit could produce pain, but would not produce infarction. However, the doctor admitted that exertion would increase the demand of the heart for blood. Also, both Dr. Riggall and Dr. Brown agreed that the doctor who examines the patient is in a better position to render an opinion than a doctor who had no personal contact, but renders an opinion simply on the basis of a hypothetical question.

Dr. Charles T. Chamberlain, a physician of Fort Smith, stated that the mechanism that occluded a coronary artery could not be determined in the absence of a post-mortem or autopsy; and though agreeing that work involving the use of the hands above the head is more strenuous than work at heart or chest level, he was of the opinion that no specific act can be held responsible for the production of a myocardial infarction through the mechanism of a thrombosis or occlusion, except in very rare instances.

As indicated by appellants' sole point for reversal, this appeal is primarily an attempt to persuade this Court to re-examine and modify prior holdings in "heart attack" cases. In *Bryant Stave and Heading Company v. White*, 227 Ark. 147, 296 S. W. 2d 436, this Court held that it is unnecessary to make a showing of unusual strain or exertion in order to sustain an award under the compensation law. That rule has been applied to all workmen's compensation cases, including those based on death or disability resulting from heart attacks. In their brief, counsel state:

"Appellants have no quarrel with the Bryant case, for it is clear that an individual's ordinary work load may over a period of time by a process of attrition, produce injuries which are in every respect as disabling as those brought about by sudden or fortuitous events. But

it is appellants' purpose here to try to demonstrate to the Court that a rule established in a case concerned with a ruptured intervertebral disc is, in the light of recent medical developments, scientifically unsound when applied to a case involving the altogether distinct condition of myocardial infarction resulting from coronary occlusion.

\* \* \* \* \* \*

The area of controversy among medical men centers around the question of whether effort or exercise can ever, under any circumstances, trigger an arterial spasm, a subintimal hemorrhage, or a coronary blood clot, so as to produce a coronary occlusion and consequent myocardial infarction. On this point, medical opinion is divided into three groups. Those who believe that effort sometimes can and does activate these mechanisms, those who believe that effort never is causally related to a coronary occlusion and those who believe that violent or extreme effort may, in rare instances, cause the rupture of an atheromatous plaque and the consequent formation of a subintimal hemorrhage or hematoma. The vast majority of leading internists and cardiologists in the United States believe either that effort never plays any part in this kind of heart attack or that it contributes to the attack rarely and only then when the episode of effort is violent or extreme.''

During examination of the medical witnesses, counsel for appellants brought out that certain eminent physicians hold the opinion that effort is not a significant factor leading to coronary thrombosis,[3] and appellants rely to large extent upon the testimony of Dr. Riggall relative to the medical surveys heretofore set out. Of course, these particular surveys favor appellants' contention, though some items appear irrelevant to this appeal; for instance, there is no contention here that work was the cause of Dorman's heart disease, and it is admitted that he had suffered previous heart attacks. Appellants' own medical

---

[3] Among others, Dr. Samuel A. Levine, Dr. Herman L. Blumgart, and Dr. Meyer Texon. In the textbook of medicine, "Cecil and Loeb", in which the section on cardiovascular disease is written by Dr. Blumgart, he states: "In most instances, acute myocardial infarction occurs without relation to effort or other discernible clinical event."

witnesses agreed that there is, over the country, a wide divergence of views concerning the part that effort plays in a myocardial infarction, and Dr. Riggall stated, "I still with some fear and trembling hesitate to tell a man to resume activity   *   *   *" At any rate, we are unpersuaded that there is such unanimity of opinion among medical authorities that it can now be said, as a matter of law, that effort never, or at most, only when violent or extreme, plays any part in producing a coronary occlusion and consequent myocardial infarction. We are still of the opinion that this is a question of fact, to be decided on the basis of evidence developed at each particular hearing, and we take occasion to re-affirm our holdings in *Safeway Stores* v. *Harrison*, 231 Ark. 10, 328 S. W. 2d 131, *Reynolds Metals Company* v. *Robbins*, 231 Ark. 158, 328 S. W. 2d 489, and *E. P. Bettendorf & Co., et al* v. *Kelly*, 229 Ark. 672, 317 S. W. 2d 708.

Appellants also contend, that even though we disagree with this primary contention and hold that exertion can contribute to a coronary occlusion, the evidence in the present case is insufficient since appellees' medical witnesses were unable to pinpoint the specific mechanism precipitating Dorman's attack. We find no merit in this contention. Appellants state, "There is no way to determine which of the several mechanisms have occluded a coronary artery in the absence of a post mortem." Were we to agree with this contention, it would simply mean that recovery could never be made in a heart attack case unless an autopsy had been performed. Though helpful as pertinent evidence, we do not agree that such a requirement is absolute. Doctors frequently reach their conclusions on the basis of physical examinations, together with case histories. It might be mentioned that one can, of course, suffer a heart attack without dying, and can draw disability payments if the attack was occasioned or contributed to by work on the job; it goes without saying that proof establishing such disability could not include an autopsy. The same contention was made in the case of *American Life Insurance Company* v. *Moore*, 216 Ark. 44, 223 S. W. 2d 1019. While this was not a compensation

case, the same logic applies. In that case, the doctor who testified for appellee stated that after examining the body and learning the history of the case, he attributed death to a pulmonary embolism resulting from a fracture. Quoting:

"On cross-examination Dr. Monroe admitted that there are cases known to the medical profession in which pulmonary embolism has been caused other than by accidental injury or surgery. In this case an autopsy would have been required to determine the cause of death with certainty. Nevertheless, Dr. Monroe reiterated his opinion that Looney's death resulted from pulmonary embolism caused by the accidental injury. On the other hand, appellant's medical witness—who stated that he was as familiar with the subject as the average physician —testified that an embolism never occurs more than three weeks after the injury. In his opinion, based on his own experience and the textbooks he had examined a few days before the trial, it was not possible for an injury sustained on May 31 to produce pulmonary embolism on July 12— an interval of forty-two days.

\* \* \* \* \* \* \* \*

"Appellant insists that Dr. Monroe's testimony is speculative, since he admitted the possibility that death was due to some other cause. But medicine, like the law, is not an exact science. If mathematical certainty were required, a surgeon would act at his peril in advising his patient to undergo an operation. The law does not compel adherence to a standard so precise. The effect of Dr. Monroe's testimony is that in his opinion the most probable cause of death was a pulmonary embolism attributable to the fractured leg."

In *Herron Lumber Company* v. *Neal,* 205 Ark. 1093, 172 S. W. 2d 252, we held that circumstantial evidence is sufficient to support an award of the Workmen's Compensation Commission, and it may be based upon the reasonable inference arising from the reasonable probabilities flowing from the evidence, and absolute certainty is not required.

Witnesses classed as experts are permitted to give their opinion for the very reason they are considered experts, and their opinions are frequently based, and expressed, purely in answer to a hypothetical question — without ever seeing the patient — as is the case with appellants' expert witnesses in this litigation. Dr. Hall was designated as an outstanding heart doctor by appellants' medical witnesses, and in addition, he, as already stated, was the only one of the doctors to actually personally examine deceased.

In *Bettendorf* v. *Kelly, supra,* Kelly was engaged in driving nails into boards when he suffered his heart attack. Repeating our language in the *Bryant Stave and Heading Company* v. *White, supra,* we held:

"* * * an accidental injury arises out of the employment when the required exertion producing the injury is too great for the person undertaking the work, whatever the degree of exertion or the condition of his health, provided the exertion is either the sole or a contributing cause of the injury. In short, an injury is accidental when either the cause or result is unexpected or accidental, although the work being done is usual or ordinary."

Dorman was engaged in driving nails into the ceiling (which incidentally, though not the controlling or determinative factor in this case, is considered rather strenuous carpentry work), and we hold, under the authority of the cases cited herein, that there was substantial evidence to justify the Commission's finding "that the exertion put forth by the deceased on September 9, 1958, was either the sole or contributing cause of the injury."

Affirmed.