INTERNATIONAL PAPER Co. *v.* MYERS.

5-2349                                                    345 S. W. 2d 1

Opinion delivered April 3, 1961.

[Rehearing denied May 1, 1961.]

*Gaughan & Laney,* for appellant.

*McMath, Leatherman, Woods & Youngdahl,* for appellees.

CARLETON HARRIS, Chief Justice. This is a workmen's compensation case. Fletcher Myers, age 43, was an employee of International Paper Company, having been so employed from May 15, 1948, until and including the afternoon of February 26, 1958, when he suffered a heart attack about 5 p.m., and died in the car of a neighbor, who had been called to drive him from the plant to the hospital, located in Camden. The claim for death benefits and funeral allowance under the Workmen's Compensation Act was filed by Elizabeth Myers, the widow, in behalf of herself and two children. The claim was heard by the referee, who concluded that the death resulted from accidental injury arising out of, and in the course of employment, and awarded benefits to claimants. On appeal, the full Commission affirmed this award. The judgment of the Commission was affirmed by the Circuit Court of Ouachita County, and appellant has perfected this appeal. Five points are urged for reversal, but actually, all relate to a single question, *viz.*, "Does the medical testimony support the finding of the Commission that there was a causal connection between the deceased's fatal heart attack and the work he was doing on the date of his death?"

Myers worked as a tube lancer in connection with a water tube boiler. This work consisted of putting a tube, approximately 12 feet long and weighing in the neighborhood of 20 pounds, into small portholes in the side of an eight story boiler. The tube was connected to a high pressure (approximately 120 pounds) steam hose. The steam is used to remove accumulations from water pipes inside the boiler to prevent these accumulations from insulating the pipes, and lessening the steam produced. Myers generally worked as a "second helper" or "port puncher" downstairs, but he had commenced this last job as a tube lancer three or four days prior to his death, though he had also previously done this type of work. During an eight hour shift, the tube lancers worked from the eighth floor down to the fifth. Buddy Sevier, who worked with Myers, explained the operation as follows: The lance tube, or rod, has two holes at the end (on each

side), which expels the steam. The steam hose brings the steam into the rod. The rod is balanced in the port and worked up and down, and then moved to the next port. Sevier stated that frequently a film forms, and cakes on the tubes, and "you have to jar it off." According to the witness, the work on the seventh floor (where Myers was working at the time of the attack) was harder than on the other floors. As reflected by subsequent evidence, this was because more portholes on the seventh floor tended to "stop up" than on the others, and a person was required to stoop over more to get the rod into the porthole. Sevier testified that about 5 o'clock, he and Myers stopped work in order to eat supper; that they would take time about going after the food, and it was his (Sevier's) day to go. Myers told him that he wanted a cheeseburger, and a pint of milk, but as the witness started to leave, changed his mind, and directed Sevier to get him a full lunch and a pint of milk. He stated that as far as he knew, Myers felt all right, and that nothing had happened out of the ordinary that afternoon in connection with their work. As Sevier returned with the lunches, he saw Myers walking toward the first aid station, but did not talk with him. H. W. Ashworth, in charge of the boiler room where Myers worked, testified that the job Myers was working on at the time of the heart attack was not as difficult as the job he had been doing (second helper). O. E. Shambley, head "tube lancer," testified that the work was "hotter and harder" downstairs, but like Myers, he preferred downstairs work because there were more people there to talk with. Shambley stated that he had never heard Myers complain about feeling bad in any way until the date of his death, when the latter, while waiting for his supper, stated, "I'm going down to first aid and get something for my indigestion." Jeanette Lemmons, employed by International as a nurse at the first aid station in the Camden mill, testified that she was on duty when Myers reported to the station, and asked for a dose of citrocarbonate; that he complained that his ulcers were "acting up;" also, "my arm is hurting me," and that he stated the pain was radiating back in his left

shoulder. Myers was insistent upon returning to work, but the nurse persuaded him that he should be examined by Dr. Perry Dalton. He requested her to call his next door neighbor, Carl Tucker, Jr., for the purpose of taking him to the hospital. Tucker responded, and testified that Myers walked out of the first aid station, got in the car, and they left immediately for the hospital; ''I asked him what his trouble was. He said he had a hurting in his chest, hurting down both arms, said his fingers were tingling on both hands. I asked him if he ever had any trouble before like that and he said he did, said it had been bothering him about two weeks, especially when they were shaking those tubes he had a sharp pain in his chest.''[1] Tucker stated that Myers died after they had traveled about one mile. Elizabeth Myers, widow, was not aware of her husband being afflicted with heart trouble, and stated that he had no physical complaints during the months before he died, other than, for about two years prior to his death, he had complained many times of being ''exhausted'' when he came home, and would sometimes mention pain in his arms and legs.

The rules which govern this case have been reiterated with frequency, and no new question is presented. Actually, appellant's arguments appear to be somewhat directed to an attempt to persuade the court to change its holding, as set forth in *Bryant Stave and Heading Co.* v. *White*, 227 Ark. 147, 296 S. W. 2d 436, wherein we said:

''* * * that an accidental injury arises out of the employment when the required exertion producing the injury is too great for the person undertaking the work, whatever the degree of exertion or the condition of his health, provided the exertion is either the sole or a contributing cause of the injury.''

This rule has been followed in cases involving heart seizures, but we have also repeatedly held that there must be a causal connection between the claimant's work

---

[1] This testimony was disputed by J. E. Nunn, who testified that Tucker told him there was no conversation except that Myers told him he was having trouble with his ulcer.

and the heart attack. *Crossett Chemical Company* v. *Sedberry,* 232 Ark. 608, 339 S. W. 2d 426. Appellant states, "So long as the ordinary physical exertion involved in the employee's regular work, especially where strain and effort is not unusual, is accepted as being the contributory cause of the heart attack, there will be confusion, and the practical point of this is to make the employer the insurer." We do not understand why there should be confusion, since we have consistently, from the time of its rendition, followed the *Bryant* case. *Reynolds Metals Company* v. *Robbins,* 231 Ark. 158, 328 S. W. 2d 489, *U. S. Fidelity & Guaranty Co.* v. *Dorman,* 232 Ark. 749, 340 S. W. 2d 266, *Crossett Chemical Company* v. *Sedberry, supra.* Of course, the Commission makes the findings of fact, and we are only concerned with whether such findings are supported by substantial evidence. *Reynolds Metals Company* v. *Robbins, supra.*

Dr. Perry J. Dalton, general practitioner of Camden, and Dr. Drew F. Agar of Little Rock, specializing in internal medicine, testified on behalf of the appellant company, while Dr. Phillip T. Cullen of Little Rock, likewise specializing in internal medicine, testified on behalf of appellee.

Dr. Dalton testified that he had known Myers for eight or ten years, and had attended him and his family on several occasions. He stated that he had not seen Myers for a month or six weeks prior to his death. The doctor testified that in his opinion, death was due to a coronary occlusion; that no autopsy was made since he did not consider one necessary. The witness stated that he had never treated Myers for any heart condition, and had never observed any evidence of coronary disease. He testified that Myers had complained of indigestion at intervals over a period of six to eight years; that one can have coronary artery disease without objective symptoms. Dr. Dalton did state that undue fatigue without abnormal exertion could be a symptom of a pre-existing coronary disease. It was the doctor's opinion that if Myers' work was the same that he was accustomed to doing, the work would have no connection

with the heart attack. Dr. Agar was of the opinion that there was no causal relationship between Myers' death from the heart attack, and the work he was doing; that a heart attack could have happened just as easily if he had been at home on his front porch. The witness stated that there are different schools of thought on the effect of exertion on heart disease. Dr. Agar testified that the pain Myers described as ulcers or indigestion, probably was a heart pain, and the doctor stated that if Myers died of a coronary occlusion, "he had that heart disease before."

Dr. Cullen testified that he agreed with Dr. Dalton that a cardiac condition was the immediate cause of Myers' death. Dr. Cullen stated that physical exertion is often a contributing factor to death where there is existing cardiac disease. He said that people frequently think they are having indigestion when, in reality, the pain is caused by a heart condition. The witness testified that in his opinion, Myers had a pre-existing heart disease. "The fact that he died from the heart attack in itself is enough evidence for me that he had a pre-existing heart disease." This statement was based on the doctor's opinion that a healthy heart cannot be injured by ordinary activity or even fairly strenuous activity. He stated that it was not unusual for a person, with pre-existing heart disease, to die shortly after exertion. Dr. Cullen was of the positive opinion that the work being performed by Myers was a causal or aggravating factor contributing to his death.

It is evident from the testimony in this case, and the testimony in the cases cited, that there is a wide divergence of views in the medical profession relative to the causes of heart attacks. These views were discussed somewhat in detail in *U. S. Fidelity & Guaranty Co.* v. *Dorman, supra.* There, too, as in the instant case, the appeal was primarily an attempt to persuade this Court to re-examine and modify its holdings in heart attack cases. We declined to do so, stating:

"* * * we are unpersuaded that there is such unanimity of opinion among medical authorities that it

can now be said, as a matter of law, that effort never, or at most, only when violent or extreme, plays any part in producing a coronary occlusion and consequent myocardial infarction. We are still of the opinion that this is a question of fact, to be decided on the basis of evidence developed at each particular hearing, and we take occasion to re-affirm our holdings in *Safeway Stores* v. *Harrison,* 231 Ark. 10, 328 S. W. 2d 131, *Reynolds Metals Company* v. *Robbins,* 231 Ark. 159, 328 S. W. 2d 489, and *E. P. Bettendorf & Co., et al* v. *Kelly,* 229 Ark. 672, 317 S. W. 2d 708.''

The Commission found for appellee, and we think there was substantial evidence to support this finding. As stated in the *Sedberry* case:

''The question before the commission was fundamentally one of fact, and we find its decision to be supported by substantial evidence. This concludes our inquiry.''

Affirmed.