C. P. Chaney Sawmill, Inc. *v*. Robertson.

5-2428

Opinion delivered June 5, 1961.

[Rehearing denied September 11, 1961.]

*Riddick Riffel,* for appellant.

*McMath, Leatherman, Woods & Youngdahl,* for appellee.

Carleton Harris, Chief Justice. This is a Workmen's Compensation case, and is an appeal from the judgment of the Arkansas County Circuit Court, Southern District, wherein an order of the Commission, denying compensation benefits to appellee, was reversed. The Commission had upheld the findings of its Referee denying compensation.

C. P. Robertson was a lumber scaler and inspector for the C. P. Chaney Sawmill, Inc., and prior to noon, on June 12, 1959, had been engaged in supervising the loading of lumber into a box car. Robertson did not personally load lumber, but inspected and graded same prior to the loading, by the use of a measuring stick with which he turned over the boards and measured them while they were stacked fifty inches high on the loading platform. Robertson sometimes climbed onto the stacks while grading the lumber, and had pursued this type of work for several years. At noon on June 12th, Robertson went to a nearby restaurant and had lunch. Upon his return, while standing on the loading platform,

giving instructions to the crew (just starting back to work), for the afternoon work program, he collapsed and died. This occurred at about five minutes after one. G. L. Moore, Lewis Ellis, and Earl Gammons, employees of the lumber company, testified at the hearing before the Referee, as well as C. P. Chaney, owner of the mill, and Doctors R. H. Whitehead, a physician of DeWitt, and Howard Dishongh, a physician of Little Rock. The testimony of Mrs. Robertson was introduced into the record by stipulation. Dr. E. Lloyd Wilbur of Little Rock testified before the full Commission, and a letter-report from Dr. Philip T. Cullen of Little Rock was offered in behalf of claimant. Witnesses Ellis and Chaney classified Robertson's duties as "light work"; Gammons stated that "it is not as hard as a lot of work," while Moore gave no opinion one way or another relative to the degree of labor required. The witnesses who were present when Mr. Robertson died (Ellis, Moore, Gammons) agreed that he was performing no actual physical labor, but only talking, at the time he collapsed. The stipulation set forth that Mrs. Robertson, if present, would testify that Mr. Robertson had several times arrived home on a Friday night, and stated that his chest had been hurting during the week. "One Friday last spring he came home from DeWitt and was complaining of his chest hurting." Further:

"When he talked about his chest pains, I tried to get him to go see a doctor, to let me get him an appointment with a doctor, and he would say, 'No, some weekend, I will.' He frequently complained of one of his arms hurting, and I have seen him sit in the kitchen and rub it. He quit smoking about four years ago because of chest pains. He had smoked ever since he was a boy, but he thought it was his lungs, and quit smoking."

The stipulation further reveals that she stated he had complained of his chest hurting a few weeks before he died.

Of course, as reflected by case after case, we simply determine if there is any substantial evidence to support the findings of the Commission. *Reynolds Metals Co.* v.

*Robbins,* 231 Ark. 158, 328 S. W. 2d 489, *Fort Smith Couch and Bedding Co.* v. *Jones,* 231 Ark. 790, 332 S. W. 2d 817, Whitehead, general practitioner of DeWitt, was called to the scene after Robertson's death. The two men were good friends, and had breakfast together at a restaurant in DeWitt on the day of the fatal attack. Robertson complained to Whitehead that he felt bad, thought he was taking a cold, but did not have time to see a doctor. Whitehead stated that, in his opinion, though he could not be sure, Robertson died of a coronary insufficiency. The doctor was of the view that any physical effort, on the part of a person with a coronary insufficiency, would aggravate such condition. He had never treated Robertson. He was asked:

"Q. If Mr. Robertson was suffering from a heart condition, the fact that he went to work and worked until 1 o'clock that day, would that aggravate the heart condition?

"A. It very likely would, yes, sir."

Further:

"Q. Now, do you arrive at the conclusion that going to work, if he had a heart condition, would aggravate the condition solely on the thought that one who had a heart condition should rest and not work?

"A. Well, we know that that is the best thing they can do, is rest.

"Q. Is that the reason you say his work might have aggravated it?

"A. Could have aggravated it, yes, sir."

Whitehead had previously given a statement to an investigator wherein he stated that, "It is my opinion that his death did not occur as a result of his work or employment," but the Doctor testified, "Continual work, of course, we know, aggravates a heart condition."

Dr. Philip Cullen, Little Rock cardiologist, in his letter, stated that it was his opinion that Robertson suf-

fered from a chronic and progressive coronary sclerosis. Quoting from his letter:

"Increased demands upon the heart muscle from work, eating, emotion, fatigue, warm environment, etc., could produce coronary failure, and myocardial infarction causing death. It is likely that even usual activity, on the day of his death, was a contributory cause of death."

While Dr. Dishongh agreed with Dr. Whitehead that coronary insufficiency was the cause of Robertson's death, more specifically, a coronary occlusion,[1] and further stated that the disease was evidently far advanced at that time, he was definitely of the opinion that Robertson's work did not aggravate his condition. He was asked:

"Q. Doctor, assuming that Mr. Robertson was standing on this loading platform at approximately 1 o'clock in the afternoon, having just returned from his lunch, and outlining the work to be done by himself or other men, but doing no physical activity, and had before his lunch hour been engaged in his normal and usual work of scaling lumber which, according to the evidence, is described as light work, would those activities, in your opinion, aggravate any pre-existing condition of a heart nature which Mr. Robertson may have had?

"A. I don't think the work that he was doing would have aggravated it; no."

Learned counsel for appellee point out that the doctor agreed that a man suffering from a coronary insufficiency should have rested, rather than gone to work, and that the usual work of one suffering from such a condition could constitute an exertion. Counsel, quoting from a publication by Meyer Texon, entitled "Heart Disease and Industry," asked the question:

---

[1] The doctor explained that there are different stages of an insufficiency, and that in case of a sudden death, it means that a coronary artery has been occluded. As shown by the testimony, a coronary insufficiency is incompetent heart action, caused by a restriction of blood supply to the myocardium, and consequent lack of oxygen supply in that organ. It is characterized by anginal pains.

"Q. Well, he says, and I quote again: 'That effort through the mechanism of coronary insufficiency may precipitate myocardial infarction without occlusion, induce heart failure and in fact, cause sudden death.'

"A. I guess it could precipitate it; yes, sir."

Dr. E. Lloyd Wilbur testified that he had read the report of Dr. Cullen, and the testimony of Dr. Whitehead, and he agreed that Robertson died from coronary artery disease. This witness was of the opinion that Robertson's activity did not contribute to his death on June 12th. He stated, that in arriving at his conclusion, he took into consideration the stipulation wherein Mrs. Robertson said that her husband had experienced chest pains. The doctor stated that he would assume these pains to be angina pectoris, but pointed out that she did not state whether such pains came after work, during work, at night, or just when. Wilbur was of the opinion that if an activity on the part of an individual produced his death, such death would occur almost immediately after his fatal activity. The doctor testified:

"All the books that talk about angina pectoris mention that it can be precipitated, the pain and the attack, by exercise, by eating, by an emotional strain or by sudden exposure—usually cold weather, but hot weather is a strain also; but I think cold weather is a greater strain than hot weather.

\* \* \* \* \*

"Many of these patients do have their pain after eating, and to me, his lunch is the most important single precipitating factor."

Dr. Wilbur explained this statement by stating that the process of digestion requires more blood than when the stomach is at rest.

Appellee directs attention to the fact that Dr. Dishongh was not familiar with the statement of Mrs. Robertson concerning the pains had by her husband, until taking the stand, and she emphasizes that, on cross-examination, in answer to questions propounded by counsel, the doctor agreed that getting out of bed, going

to work, and working on the platform, would have aggravated his condition. These three answers of "yes," and "that's right," constitute the only evidence in the record that Robertson's work, on the day of his death, would have contributed to his demise, and were based upon the doctor's belief that any effort constitutes, to some extent, an exertion. However, Dr. Dishongh also stated that many people with coronary insufficiency, go about their normal duties, and that it would be necessary to discover the extent of the insufficiency in order to determine whether one's ordinary duties aggravated the insufficiency to the point of causing an occlusion. He further testified that after acquiring the information contained in the stipulation, he was still of the opinion that Robertson's work did not aggravate his condition.

Appellee also complains that the finding of the Referee and Commission that "there is no actual proof as to the cause of the death of deceased, nor is there any proof that deceased had any pre-existing arteriosclerotic vascular disease" is entirely erroneous and entirely unsupported by the proof. We see no need to discuss this point, for even though we should hold this finding erroneous, that, in itself, would not reverse the Commission, for appellee must go further and establish that Robertson's work aggravated his pre-existing condition. We cannot agree that this was done. Dr. Whitehead made no positive statement that this was true, using the terms, "very likely" and "could have," and, of course, the strength of even this testimony was diminished by the earlier statement given that the work had not contributed to Robertson's death. Dr. Cullen's letter mentions several things that could produce myocardial infarction causing death, and then concludes, "It is likely, that even usual activity, on the day of his death, was a contributory cause of death." Aside from the fact that this last does not constitute a positive statement, it is also not clear whether he refers to all activities mentioned in the letter, or some particular activity. Be that as it may, it is very apparent that Dr. Wilbur considered the precipitating cause of the attack to be the meal that had just been partaken of. Wilbur disagreed with Cullen's

statement that even Robertson's usual activity on the day of his death was a contributing cause, stating:

"You get back to the problem that is insoluble, of course, why didn't it cause the death the day before, at which time he was having probably the same amount of activity that he had here. There's certainly something that must have occurred differently today than the day before; possibly more food; maybe his coronaries were in worse condition that day. But I don't think that it is right to attribute to his usual activity as much importance as this last sentence attributes because the very processes of living for all of us gradually resolve in a certain wearing down or breaking down of our bodies."

Further:

"I believe this; that if activity is going to cause a coronary failure resulting in death or even in myocardial infarction without death, that it will do so either while that activity is going on or within minutes afterwards, and by minutes, I mean not to exceed twenty minutes. So the only thing that I can relate his death at this particular time to is his meal."

As previously mentioned, no physician gave a "flat out" opinion that Robertson's work on June 12th aggravated his condition to the extent of causing the heart attack. To reverse the Commission's order would require the overruling of dozens of cases setting out the substantial evidence rule.

We hold there was substantial evidence to support the finding of the Commission that claimant had failed to show by a preponderance of the evidence that Robertson died as a result of an accidental injury arising out of, and in the course of his employment; the judgment of the Circuit Court is accordingly reversed, and the cause remanded with directions to affirm the order rendered by the Commission denying the claim for compensation.

JOHNSON, J., dissents.

JIM JOHNSON, Associate Justice, dissenting. I am unable to agree with the majority opinion because, as I see

it, the record clearly fails to support the referee's findings. The referee's findings and conclusions were adopted *in toto* by the Full Commission.

The questioned portion of the findings is as follows:

"That there is no actual proof as to the cause of death of deceased, nor is there any proof that deceased had a pre-existing arteriosclerotic vascular disease."

As I view the record there is abundant proof as to the cause of the death of the deceased. All four doctors testified that the man died from a heart condition. Dr. Whitehead, who saw him immediately after his death, testified that he died as a result of coronary insufficiency. Dr. Cullen expressed the opinion that "the cause of death was probably myocardial infarction resulting from occlusion of a coronary artery. It appears that Mr. Robertson had coronary insufficiency for some weeks preceding his death." Dr. Dishongh testified that he agreed with Dr. Whitehead that the man died of a coronary insufficiency, and Dr. Wilbur testified: "I think he died from coronary artery disease."

Certainly from a review of the record set out above, the Commission's findings "That there is no actual proof as to the cause of the death of deceased" cannot be said to be supported by substantial evidence.

As to the findings "nor is there any proof that deceased had a pre-existing arteriosclerotic vascular disease," the record reflects the following: Dr. Whitehead testified that the man had a coronary insufficiency or a coronary occlusion secondary to atheriosclerosis.

Dr. Cullen expressed the opinion: "My opinion, based on a study of the transcript and a careful review of the doctor's testimony, is that Mr. Robertson suffered from a chronic and progressive coronary sclerosis."

Dr. Dishongh testified that he would agree with Dr. Whitehead that the man had a coronary insufficiency and that he thought the coronary insufficiency had brought on the occlusion. He was asked this specific question:

"Q. Well then, an occlusion is a dead end of an arteriosclerotic condition?

"A. Yes, it is where the artery is occluded and no blood gets in there."

In reading from a reference work Dr. Dishongh was asked the following question:

"Q. He further states that 'However, the heart which is already impaired by a coronary atherosclerosis or a hypertrophy is more susceptible to coronary insufficiency.'

"A. That is correct."

Dr. Dishongh further testified:

"An occlusion means an occluded—an occlusion of the lumen of the arteries. It's like this: (drawing diagram) Let that be the inside of the arteries. You can have an occlusion where a blood clot forms there. You can have it where you've got an arteriosclerotic condition that comes in and makes it—this really closes up sometimes. Or you can have it—let that be the same artery—you can have it with a spasm—when that artery goes into a spasm that is occluded. As soon as that spasm recedes it can go back to—sometimes when you have this condition is when you have some pain in your chest."

Dr. Dishongh testified as follows:

"I think if we'd all known that this man had this coronary condition prior to his death it might have been a different story, but I mean this, when I got here was the first time that I was told that he might have had some pre-existing condition."

And he further testified:

"Q. And the fact that he died of a coronary condition is certainly evidence that the disease was far advanced at that time. Is that not right, Doctor?

"A. That is right."

In addition to the Doctor's testimony, the widow of the deceased gave a statement which was by stipulation

included in the record. She told about her husband's persistent chest pains, about his arms hurting, about his having a blackout and about his inability to sleep because of his chest.

On the basis of this additional medical testimony and Mr. Robertson's widow's testimony, I cannot agree that a finding of fact that there was no proof that the deceased had a pre-existing arteriosclerotic vascular disease is based on substantial evidence.

From what has been said it is clear to me that the record fails to support the Commission's findings. Even the substantial evidence rule, with all of its alleged strength, cannot suffice to supply facts which from the record as I read it do not exist.

Therefore, since, in my opinion, these questioned portions of the Commission's findings are the "facts" upon which the Commission's conclusion (that deceased did not die as a result of an injury arising out of and in the course of his employment) hinges, I respectfully dissent.