LATIMER *v.* SEVIER COUNTY FARMERS' COOPERATIVE, INC.

5-2430                                    346 S. W. 2d 673

Opinion delivered June 5, 1961.

*Ben Core,* for appellant.

*Shaver, Tackett & Jones,* for appellee.

SAM ROBINSON, Associate Justice. This is a workmen's compensation case. Appellant is the widow of O. O. Latimer, who fell dead while at work for appellee, Sevier County Farmers' Cooperative, Inc., and Mrs. Latimer has appealed from an order of the Workmen's Compensation Commission denying an award of compensation. Mr. Latimer had worked for the Co-op for several years. One of his duties was to help unload freight consisting of 100 pound sacks of feed at the Co-op's place of business at Lockesburg. The feed was shipped 600 sacks to the freight car and was then moved by truck from the cars to the Co-op's place of business, where Mr. Latimer would help unload it. On August 17th, 19th and 20th, Latimer helped to unload cars of feed. On August 21st he opened the place of business

about 7:30 a.m. There was a customer waiting to buy feed and ordered four 100 pound sacks. Mr. Latimer loaded the sacks of feed on a two-wheel truck and rolled it to the front of the store, where he and the customer loaded it into a pick-up truck. This was the same kind of work Mr. Latimer had been accustomed to doing for a long time. After the loading of the feed in the truck, Latimer returned to the inside of the store. A young lady engaged in Salvation Army work entered the store to sell a magazine. Mr. Latimer started toward her, pushing the two-wheel truck, and suddenly fell dead. Appellant contends that the work he had done that morning, coupled with the work he had been doing during the past several months, and particularly for the past several days, along with worry over an employee's quitting and the responsibility of selecting a new employee, had a causal connection with his death.

In *U. S. F. & G. Co.* v. *Dorman*, 232 Ark. 749, 317 S. W. 2d 708, this Court quoted from *Bettendorf* v. *Kelly*, 229 Ark. 672, 317 S. W. 2d 708, as follows: " '. . . an accidental injury arises out of the employment when the required exertion producing the injury is too great for the person undertaking the work, whatever the degree of exertion or the condition of his health, provided the exertion is either the sole or a contributing cause of the injury. In short, an injury is accidental when either the cause or result is unexpected or accidental, although the work being done is usual or ordinary.' "

The question in the case at bar is whether the Workmen's Compensation Commission's conclusion that appellant failed to establish a causal relation between Mr. Latimer's employment and his death is supported by substantial evidence. *McFall* v. *Farmers Tractor & Truck Co.*, 227 Ark. 985, 302 S. W. 2d 801.

Immediately preceding August 17th, Latimer had been on a two weeks' vacation, during which time he drove a tractor, cutting brush on his 200 acre farm. He also drove a tractor on his farm until 10:00 p.m. on the night of August 19th, after having helped unload a car

of feed that day. Dr. R. B. Dickinson, a witness produced by appellant, testified that the symptoms showed that Mr. Latimer "obviously" died in some "circulatory shock condition," and "your first choice would be coronary thrombosis. There are very few things that produce sudden death in a human, and that's one of them and the most common cause of sudden death . . . perspiration and pallor and so forth are symptoms of shock, and the cianosis, in other words, the blueness of his face, tells you the man had a severe pulmonary in the veins of the head and neck, which is a very common occurrence in coronary thrombosis. There's no heart sufficient to pump the flow of blood and the veins color rapidly. And the lungs are full and he doesn't aireate at all. That produces the blueness or cianosis."

To sustain her contention that there was a causal relation between Latimer's death and his work, appellant proved that immediately preceding his death he had been doing exactly the same kind of work that he had done for a long time; that perhaps he had not been feeling well for several months; that he complained of dizziness a few days before his. death; and that he had been under somewhat of a nervous strain because a good employee was leaving and he, Latimer, would have the responsibility of selecting a new one. In addition, appellant produced as a witness Dr. Dickinson, but the doctor did not say that in his opinion Latimer's work contributed to his death. True, he said that physical exertion could precipitate a coronary thrombosis and that mental strain could have its effect in that respect, but when asked the direct question, "Could you say as a medical doctor, in your opinion, whether or not the fact that he [Latimer] merely unloaded this feed in the customary way was the cause of his death?", the doctor answered, "I can't say it is or that it isn't."

"Q. In other words, in your opinon he could have died with a heart attack that morning whether he had done anything or not?

"A. Yes, that's certainly possible.

"Q. . . . It is your testimony that you can't say the fact that he unloaded these sacks in the truck—you can't say either way whether or not that was the producing cause of his death?

"A. In my opinion, physical exertion can precipitate a coronary thrombosis. I cannot say that it did in this man's case."

Dr. Drew Agar, a witness produced by appellee, testified that "Assuming that he did die of a heart attack or coronary thrombosis it is my professional opinion that the work in which he was engaged at the time had no causal relationship with his death."

We have said many times that an order of the Workmen's Compensation Commission making or refusing an award in a workmen's compensation case will not be disturbed if there is any substantial evidence to support it. Credibility of witnesses is something for the Commission to determine, and this Court cannot say Dr. Agar's testimony is not substantial evidence. Appellant points out that there have been cases in this Court involving death or disability due to heart attacks where the results do not appear to be consistent. This is inevitably true where questions of fact are involved, and the same thing would be true if the finding of facts was made by the Commission, a jury, or the court. There are hardly any cases where a jury, a court or a commission would find the facts to be exactly the same and arrive at exactly the same result.

Since the finding of the Commission is supported by substantial evidence, the judgment is affirmed.

JOHNSON, J., dissents.

JIM JOHNSON, Associate Justice, dissenting. I am unable to agree with the majority opinion because, as I see it, the proof shows that Osceola O. Latimer became the manager of the Lockesburg store on August 29, 1956, and continued in that position until his death. A major item carried by the store was sack feed in 100 lb. bags, much of which was shipped to Lockesburg by rail, hauled from the

depot to the store in a 1½ ton truck. Shipments were in lots of 30 tons and 6 trips from the depot to the store with the truck were required to unload one car, an average of 5 tons per truck load. Osceola O. Latimer, as manager, assisted in unloading the feed, taking it into the store on a dolly and stacking it 10 sacks high.

During 1958 a total of 54 cars of feed were delivered to Lockesburg, making an average per month of 135 tons. During the first months of 1959 a total of 40 cars had already been delivered to Lockesburg, or an average of 171 tons per month and in August 1959, to and including the 20th, which was the day prior to death, 6 cars had already been delivered to Lockesburg, a total of 180 tons, with the month only two-thirds gone, and 3 of those cars, or 90 tons, had been delivered in the 4 days immediately prior to death, and the deceased had helped in the unloading of all of them. It is undisputed that the work load at the co-operative store had increased over 26 per cent in 1959 alone, to say nothing of the increase of 1958 over 1957. Wade Fisk, Mr. Latimer's helper, testified that: ''I expect there were other four-day periods in which we unloaded three cars but I know of none offhand.''

The evidence reflected that Osceola O. Latimer, about 8 or 10 months prior to his death, became weaker and began to tire more easily; his eyes began to sink back in his head and he gave the appearance of aging faster than was necessary, and this continued until his death on August 21, 1959. On August 17 he returned to work from a vacation of 2 weeks, and assisted in the unloading of a 30-ton car of feed. On August 18 he complained to Wade Fisk that he ''felt like a drunk man.'' (Mr. Latimer never used intoxicants.) On the evening of that same day he attended a board meeting of the Sevier County Farmers Cooperative in De Queen and learned for the first time that the responsibility for selecting a new employee to replace Wade Fisk was to be his sole responsibility; whereas, he had previously thought that the making of the actual selection and advising the unsuccessful applicants would be done by the manager at De Queen. He was emotionally disturbed by

this. At approximately the same time, he learned that Wade Fisk, whom he loved as a son, was planning to quit on Thursday rather than working the full week as he had previously thought. On August 19 he helped unload another 30-ton car of feed. He did the same on August 20th. On August 21st, which was to be his first day with the new helper, he arrived at the store at 7:30 a. m. whereas it was his custom to be there at 8:00 a. m., and upon arrival he found a customer, Reese Hale, waiting for the store to open. Upon opening the store, he took a dolly back into the store and, without help, lifted 4 sacks of feed onto the dolly, each weighing 100 pounds. He then pushed the dolly some 60 feet or so to the front of the store, out the front onto the sidewalk and, with the assistance of Reese Hale, lifted the four 100 pound sacks from the dolly onto the bed of the pickup truck, the last sack being much the same as if it were lifted from the ground. He then pushed the empty dolly back into the store and within a few minutes was lying dead on the floor of the store. The witness, Phyllis Warner, says that when she entered the store he was still pushing the empty dolly toward the rear of the store, that he turned and began pushing it toward her and looked as if he were about to speak when he turned very pale, gripped the dolly handles as if in shock, fell backwards and made no further movement. He was examined almost immediately by Mr. R. D. Hart, who found him very cold and drenched with perspiration, and no pulse.

Dr. R. B. Dickinson testified that the symptoms showed that Mr. Latimer ''obviously'' died in some ''circulatory shock condition,'' and ''your first choice would be coronary thrombosis. There are very few things that produce sudden death in a human, and that's one of them and the most common cause of sudden death . . . perspiration and pallor and so forth are symptoms of shock, and the cianosis, in other words, the blueness of his face, tells you the man had a severe pulmonary in the veins of the head and neck, which is a very common occurrence in coronary thrombosis. There's no heart sufficient to pump the flow of blood and the veins color rapidly. And

the lungs are full and he doesn't aireate at all. That produces the blueness or cianosis.'' The doctor then went on to say that in his opinion any type of physical exertion, including that in which Mr. Latimer was engaged, most certainly could precipitate a coronary thrombosis, and further, that emotional disturbances likewise could do so.

To counteract the testimony of Dr. Dickinson, Dr. Drew Agar was requested to give his opinion in the matter by the insurance carrier. Dr. Agar's opinion is as follows:

''At your request I examined the transcript of testimony heard before Mr. Robert Diles on December 15, 1959, concerning the case of Mrs. O. O. Latimer vs. the Sevier County Farmers Cooperative. The transcript was read in its entirety. In your letter you requested that I answer several questions, the first being whether or not this man died of a heart attack. Without benefit of a post mortem it would be impossible to say actually what caused his death. You also request that if he did die of a heart attack would I be able to say that the heart attack was caused by coronary thrombosis. There again the exact diagnosis could not be determined without benefit of autopsy examination. You also asked in my opinion whether or not based on this testimony his employment caused or contributed to his death. Assuming that he did die of a heart attack or a coronary thrombosis it is my professional opinion that the work in which he was engaged at the time had no causal relationship with his death.''

On appeal, the Circuit Court made the following reference to the above letter:

''Dr. Drew F. Agar, *as usual,* stated that in his professional opinion the work in which the deceased was engaged at the time had no causal connection with his death.'' (Emphasis added.)

Viewing the case in its entirety, it appears to me that the sole question presented for our consideration is whether Dr. Agar's statement rises to the dignity of substantial evidence upon which the Commission could base its findings. Dr. Agar did not see the deceased; he ad-

mittedly does not know what caused Mr. Latimer's death. Even if Mr. Latimer died of a heart attack, he could not say what caused it. Yet in the next breath after all of his uncertainty he very confidently says that the work deceased was engaged in at the time had no causal relationship with his death. Dr. Agar's statement contains within itself its own contradiction and in my opinion the uncertainty of the statement outweighs the certainty and causes the entirety to fall far short of rising to the dignity of substantial evidence. Particularly is this true when viewed in the light of the rule re-emphasized in *Johnson Auto Co.* v. *Kelley*, 228 Ark. 364, 307 S. W. 2d 867, which is as follows:

"In determining the sufficiency of the evidence, doubts should be resolved in favor of the claimant, and the evidence should be reasonably and liberally construed in his favor."

For the reasons stated above, I respectfully dissent.