HOERNER WALDORF CORPORATION AND
INSURANCY COMPANY OF NORTH
AMERICA v. CARL LEE ALFORD

73-99                                    500 S.W. 2d 758

Opinion delivered November 5, 1973

Smith, Williams, Friday, Eldredge & Clark, by:
George Pike Jr., for appellants.

McMath, Leatherman & Woods, for appellee.

J. FRED JONES, Justice. This is a workmen's compensation case and the question on appeal is whether there is any substantial evidence to sustain the Commission's finding that the claimant-appellee's heart attack and resulting disability grew out of, and occurred within the course of, his employment as a truck driver.

Carl Lee Alford was 58 years of age when on September 13, 1971, he suffered a severe heart attack while driving a truck-trailer rig on a return trip to Little Rock from Rossville, Tennessee, where he had delivered a truckload of corrugated paper boxes bound up in 500 pound bales. Mr. Alford had worked for the appellant-employer, Hoerner Waldorf Corporation, for approximately 20 years, the first five years as a "slitter operator,"[1] and the last 15 years as a truck driver. He had been hospitalized and treated for a hiatal hernia but that condition is of no importance in this case except as it relates to Mr. Alford's complaints as hereinafter set out. The heart attack suffered by Mr. Alford on September 13 was diagnosed as a myocardial infarction and the correctness of that diagnosis is not questioned.

It was Mr. Alford's contention before the Commission that the stress and strain of the work he performed as a truck driver brought about his heart attack on the

---

[1] The duties of a slitter operator were described as feeding paper cardboard through a machine which trimmed it to proper size for making cardboard boxes.

day in question and aggravated his pre-existing coronary atherosclerosis to the point of a myocardial infarction and permanent disability. The appellant-employer and its compensation insurance carrier contended that Mr. Alford's heart attack on September 13 was a natural result of his progressive degenerative heart disease and was unrelated to his occupation as a truck driver. The Commission found in favor of Alford and awarded compensation for a 70% permanent partial disability in addition to medical benefits that normally follow an award in favor of the claimant. The award of the Commission was affirmed by the circuit court so the employer and insurance carrier contend on this appeal that the "claimant failed to sustain his burden of proving by substantial evidence that there was any causal relationship between his driving the truck and his heart attack."

Mr. Alford testified by deposition as well as in person before the Referee. He said that September 13 was on a Monday and he did not work on the 11th or 12th. He said he just sat around the house on Saturday and Sunday and did not recall having any chest pains on Saturday or Sunday. He said on Sunday afternoon he became drowsy and felt tired and worn-out. He said he started to call his employer to get someone else to work in his place on Monday but thought he might get to feeling better so he decided to go ahead and go to work Monday. He said that he got up about 1:30 or 2:00 o'clock on Monday morning and reported to work; that his trailer was already loaded and he attached the tractor to the trailer and left on his assigned trip for the delivery of merchandise to Rossville, Tennessee. He said he stopped in Palestine, Arkansas, for breakfast and delivered his cargo in Rossville at 7 a.m. He said that prior to stopping in Palestine, he had "a kind of heavy feeling" in his chest but thought it would pass and didn't say anything to anyone about it. He said his cargo consisted of cardboard boxes bound up in bales weighing approximately 500 pounds; that when he arrived in Rossville, the bundles were unloaded with a forklift and he assisted the forklift operator in pulling over about 10 of the bundles so that the forklift could get under them. He said the heaviness he felt in his chest between Palestine and Rossville had lightened up on his return trip to Little Rock but that

after he came through Memphis, Tennessee, and West Memphis, pain in his chest started getting worse and that between Palestine and Wheatley, Arkansas, about two hours after he left Rossville, he had to pull to the side of the highway and stop. He then testified as follows:

"Q. What kind of problem were you having at that time?

A. Well, I turned deathly sick and felt like I was going to vomit, and that's the reason I jerked the tractor trailer over off the road as soon as I could, and it just felt like something just popped me in the chest right hard, and I slumped over my steering wheel, I suppose, so according to the time that I left Rossville and the time that these boys come along and all I was probably there maybe thirty or forty-five minutes. I don't know just how long it was."

Mr. Alford said two other truck drivers employed by the same company stopped and offered to bring him on in to Little Rock but he managed to bring his own truck to Little Rock. He said that after delivering his truck back to his place of employment, he went home and a day or so later was hospitalized under the treatment of Dr. William B. Bishop.

At the hearing before the Referee, Mr. Alford described his attack in more detail. He said that when he pulled his truck to the shoulder of the highway and stopped, he first laid over on his steering wheel and then got so sick he had to get out of his truck and vomit. He said that for a short time after he stopped he felt dizzy and did not know what he was doing. He said this condition soon cleared up but the pain in his chest never did cease or get any better. He described the attack as starting with sharp pain in his chest under his breast bone. He said it just kept getting worse and worse and he then testified as follows:

"When it did hit me it was a solid jolt. It just felt like someone stomped me in the chest . . . I had been hit in my chest with a bale of hay and it kind of felt

like that . . . then I knew there was something wrong with me. I had never had that to happen to me before.

Q. Now you had never had this particular type of pain before?

A. I never had.

Q. Now had you ever had any pains in your stomach or in your chest area before?

A. Yes, sir.

Q. Were they anything like this?

A. Never was, no, sir."

He said he had previously experienced pain in his stomach and chest on several occasions when he was in the hospital with a hiatal hernia. He said when his chest pains first started on the 13th, he thought perhaps it was the same thing, but it didn't start hurting in his stomach as it usually did. He said the pain started in his chest on the 13th; that it was of a different nature than he had previously experienced and when it grew worse, he knew it was not from his stomach or hernia. He said after he left Rossville on his return trip to Little Rock, the pain in his chest really started hurting bad and then kept getting worse.

Mr. Robert Cearley, production manager for the appellant-employer, testified that Mr. Alford was an excellent employee. He said Alford worked about five years as a slitter operator in the plant before being assigned to driving a truck.

Both the truck drivers who came upon Mr. Alford while he was stopped at the side of the highway on his return to Little Rock, testified that he was deathly sick, complaining of pain and said that nothing like that had ever happened before.

Orville Jenson, another truck driver for the appellant-employer, testified that a driver of a truck-trailer rig

is under constant pressure in keeping a lookout to prevent accidents and that there is a lot of heavy physical exertion involved in such work.

Dr. William B. Bishop did not testify but his letter-report dated January 26, 1972, directed to Mr. Alford's attorney, was introduced into evidence without objection. Dr. Bishop stated that Mr. Alford had been under his treatment since September 16, 1971, and in his opinion Mr. Alford had advanced arteriosclerotic heart disease with angina on exertion. Dr. Bishop stated that Mr. Alford most likely had an intramural myocardial infarction which precipitated his hospitalization from September 16 through October 11, 1971. He said that in addition, Mr. Alford had symptoms of vertebral basilar artery insufficiency. It was his opinion that Mr. Alford would be unable to resume any occupation which would require any type of physical activity "including pulling, hauling, lifting, standing or walking over a protracted period of time." Dr. Bishop concluded his report with a statement as follows:

"In that Mr. Alford's initial symptoms occurred while he was driving a truck during the course of his occupation, I would have to presume that his pre-existing condition was aggravated by his driving the truck."

At the request of the compensation insurance carrier, Mr. Alford was examined by Dr. Alfred Kahn, Jr. who reported the results of his examination and also testified by deposition. Dr. Kahn expressed the opinion that there was no causal connection between Mr. Alford's work and his heart attack on September 13. The Commission, however, was entitled to consider and weigh *all* of Dr. Kahn's testimony together with all the other evidence in arriving at its decision as to where the preponderance lies. Dr. Kahn's examination was so thorough, and his testimony so important to the question before us, we feel justified in quoting his testimony at some length. Dr. Kahn's report reads in part as follows:

"It is my opinion based on Mr. Alford's history, physical examination, laboratory work performed

elsewhere and performed here that Mr. Alford probably had an acute myocardial infarction while he was driving his truck as described in the present illness. * * * A myocardial infarction means death of heart muscle which in turn is the result of an inadequate blood flow through the coronary arteries. This inadequacy of blood flow through the coronary arteries is the result of a progressive degenerative disease seen in American males and known as coronary arteriosclerosis. This progressive degenerative disorder is accelerated by hypertensive disease, hypercholesterolemia, certain endocrine disorders as thyroid disease, sedentary living, hereditary traits, etc.; the reverse holds true. As a result of this patient's coronary artery disease, he not alone had the myocardial infarction but the inadequacy of blood flow through the coronary vessels is still symptomatic and this patient is having what is known as angina pectoris. Angina pectoris is a syndrome of chest pain caused by temporary inadequacy of blood flow through the coronary vessels; this does not produce lasting damage to the heart, but could be looked on as a warning signal that there was a temporary inadequacy of blood flow. At this time I am unable to state that this patient has failure of his heart as a pump; he does not have any notable cardiac arrhythmia.

All of this brings up the question as to whether or not this patient's work was related to his heart attack. The basic underlying cause of the patient's heart attack or myocardial infarction as it is called is coronary atherosclerosis which as I have stated above is a progressive degenerative disease of the coronary vessels. A myocardial infarction may be precipitated in the presence of coronary arteriosclerosis if the patient undergoes excessive or unusual exertion. This unusual exertion has to have a good time relationship with the onset of the symptoms or there cannot be a cause and effect relationship. In the case of Mr. Alford, I do not believe that there is any causal relationship between this man's work as a truck driver and his myocardial infarction."

Dr. Kahn then reported that he made a careful search for any other disease suffered by Mr. Alford which might simulate coronary artery disease. He said that Mr. Alford does have a hiatal hernia and he was of the opinion that some of the pain described by Mr. Alford could have come from the hernia. He found that Mr. Alford did have hypertensive cardio-vascular disease; this could definitely accelerate coronary artery degeneration. He reported that Mr. Alford did not have an elevated blood cholesterol. Dr. Kahn then concluded his report as follows:

"In summary it is my belief that Mr. Alford has had a myocardial infarction. It was due to progressive arteriosclerosis. I think he is now probably suffering from angina pectoris. I think his principal problems are totally unrelated to his work.

Currently because of the cardiac disease, I think Mr. Alford is totally incapacitated for driving a truck. At the most, Mr. Alford might have some type of sedentary job where he sat or stood for short periods of time; he should not do any heavy lifting. He should not be exposed to any extremes of fatigue or climate."

In Dr. Kahn's deposition he testified on direct examination in part as follows:

"I think the thing that occurred to Mr. Alford was this; that he had a chronic degenerative disease of the blood vessels, which involved his heart, among other places. This disease, as I stated, is progressive, and eventually the blood supply to the heart muscle is inadequate. This inadequacy might take two forms. One, the inadequacy might precipitate what is known as coronary artery insufficiency, and this is a condition in which there is an inadequate flow of blood to the heart, and as a result there is temporary pain when the individual exercises or exerts. The other disorder is known as myocardial infarction, and it's a more severe disorder, and this is characterized by a much greater impairment of blood supply, and in fact such that the individual has muscle death afterwards. It's my opinion that Mr. Alford's diagnosis is a myocardial infarction, and

that it is a severe form of loss of blood supply through the coronary vessels. This used to be called coronary artery occlusion, but we know that these individuals who have myocardial infarction may have a partially patent blood vessel and the muscle still dies. My belief is that Mr. Alford suffered a myocardial infarction while he was driving his truck. I don't think of this as being violent exertion, and I feel that the progression of the disease was the most important thing in producing his myocardial infarction."

Dr. Kahn then testified that there had been studies made to determine the effect and relationship between exertion and myocardial infarction. He said these statistics showed that 95% of myocardial infarctions occurred while the individuals were either being quiet or at least relatively sedentary. He said that in only about 5% of the cases was there found to be a relationship between the infarction and exertion. Dr. Kahn testified that he agreed with these surveys and, before he would relate a myocardial infarction to exertion, it should be clearly shown that the exertion was quite severe for the particular individual and there would have to be a good time relationship between the exertion and the onset of the symptoms. He said that from the history given him by Mr. Alford, he felt that the exertion, or activity he was engaged in while driving his truck, was not sufficient to relate his activity to his myocardial infarction. Dr. Kahn then continued on direct examination as follows:

"Q. . . . had you known, the extent of his condition before he had this attack, let's say the day before, what would have been your restriction on his activity?

A. Well, I think had I known he had had coronary artery disease sufficient to have caused a myocardial infarction, I would have told him not to take the trip. I would have taken him off this type of work.

Q. You would take him off this type of work, you mean truck driving?

A. Yes, I would. I would have put him on what I would have termed light work.

Q. And what are you putting him on now after he's had the attack; what is the nature of that. . .

A. . . . well, the same, light work.

Q. For example, could he handle a job now or after he reaches his complete healing, as a shipping clerk, for example, where he is to receive and send out materials, provided he did not have to do any lifting and provided he was given an opportunity to sit down periodically in the course of his work?

A. I think he could, provided he weren't exposed to extremes of temperature either. I think sitting and standing, no extremes of temperature, no extremes of exertion, probably a five pound limit on lifting weights and that not very repetitively."

Dr. Kahn then testified that he thought Mr. Alford might be able to carry on the job of slitting machine operator if he was not required to lift anything more than the pieces of cardboard he would feed through a machine. Dr. Kahn said that following death of heart muscle which occurs in a myocardial infarction, the dead muscle tissue is replaced by scar tissue and it is thought that this scarring process continues for around six weeks before complete healing occurs. He said that in such healing process the small blood vessels tend to open up and carry the blood in place of the large vessel which had been occluded or almost occluded.

On cross-examination Dr. Kahn made his prognosis for Mr. Alford as not good. He said any person who has had a myocardial infarction is subject to more coronary disease and that in his opinion this condition is permanent. Dr. Kahn then outlined a regular course of treatment he would suggest under the direction of Mr. Alford's attending physician, Dr. Bishop, who Dr. Kahn said "is an excellent man." Dr. Kahn then testified on cross-examination as follows:

"Q. Is it true, Doctor, that physical or chemical trauma, or a sudden exertion on the body as a whole would require an increased amount of blood?

A. Yes, certainly exertion would. I don't know that trauma would.

Q. And if the body requires an increased amount of blood, I suppose that requires the heart to work harder?

A. Yes.

Q. Where there's exertion and a patient has this narrowing of the coronary artery due to this disease, might there be an inadequate supply of blood to the heart muscle that would cause damage?

A. With exertion?

Q. Yes.

A. Yes, it's conceivable.

Q. And where you have this inadequate supply of blood to the heart muscle or the heart, may this result in pain?

A. Yes.

\* \* \*

Q. I believe you indicated that a deficiency of blood supply to the heart or heart muscle could cause a myocardial infarction?

A. Yes, it could.

Q. Is there any similarity in symptoms from a hiatal hernia and a heart condition?

A. Yes, they are quite similar at times.

Q. Would they be confusing to a patient unless they knew exactly what was wrong with them?

A. Very."

Dr. Kahn testified that whether or not emotional strain would cause damage to a diseased heart with insufficient blood supply is a very difficult question. He said that a sudden emotional shock could place additional strain on the heart but that whether or not emotional stress does lasting damage to a heart is a matter of debate. He said that he felt it could precipitate angina pectoris. He said that emotional stress could increase the heart beat and increase blood pressure.

"Q. And if the heart is already damaged it could aggravate the condition?

A. Yes, it could aggravate it, temporarily, anyway."

Dr. Kahn testified that it would not be advisable for Mr. Alford to engage in any physical labor of any magnitude and that he should limit his activities in lifting weights to not over five pounds. He said that if Mr. Alford strained very vigorously, it could cause his heart to require more oxygen; that Mr. Alford should not attempt to move a crate weighing 500 pounds, and that he should be limited to light duty in the future. He then concluded his testimony on cross-examination as follows:

"Q. Mr. Pike asked you if Mr. Alford had come to see you for advice and counsel and treatment on the 13th of September, 1971, before he started out on this trip, what restrictions you would have then placed on his job activities, and I believe you have indicated that you would have placed the same restrictions as you are now placing on him?

A. Yes, I would."

The appellants argue that Dr. Kahn was very definite in his opinion, whereas Alford's medical evidence amounts only to a bare conclusion expressed by his attending physician and is without supporting evidence. They argue that Dr. Bishop does not mention significant history in Mr. Alford's case. As already pointed out, Dr. Bishop did not testify. His deposition was not taken nor was he called as a witness by either party. Mr. Alford, however,

had been under the care and treatment of Dr. Bishop from the date of his attack and it would appear just as logical, if not more so, that Dr. Bishop did take into consideration a history given him by Mr. Alford as it would be that he did not.

The appellants cite many of our decisions in which we have reversed the Commission under the substantial evidence rule. *Ocoma Foods* v. *Grogan*, 253 Ark. 1111, 491 S.W. 2d 65, was a protruding disc case in which the condition developed over a considerable period of time and the claimant's employment consisted of sitting down and lifting nothing heavier than chicken parts.

In *Southland Corp.* v. *Hester*, 253 Ark. 959, 490 S.W. 2d 132, cited by the appellants, we reversed a Commission award in favor of the widow of a man who died of a gunshot wound. The deceased employee was found slumped at his desk with his own .22 rifle (he apparently had brought from home) propped with its butt against an electrical outlet on the floor and its muzzle against his shirt near his heart. The cause of death was a bullet wound through the heart, and there was powder burn on the shirt and if the death was accidental, there was no substantial evidence it grew out of the employment.

Another case cited by the appellants in which we reversed the Commission is the case of *International Paper Co.* v. *Langley*, 251 Ark. 859, 475 S.W. 2d 686. The primary distinction in that case was that Mr. Langley was simply handling empty paper bags seven feet long and two feet wide.[2] Langley had just returned from lunch and picked up one of the paper bags when he experienced one of his many heart attacks. The appellants also cite numerous cases in which we have sustained the Commission under the substantial evidence rule, but each case turns on its own peculiar facts and we only search the record to determine if there is any substantial evidence that will support the decision reached by the Commission.

Heart cases are within the most difficult area of workmen's compensation law, primarily because it is

[2]Approximately the same type of light work Alford did as a "slitter Operator" and which the doctors say he might still be able to do.

common knowledge that disabling heart attacks do occur in many instances without apparent reason as to time and activity. It has become a matter of common knowledge that excessive exertion or strain on a weak or diseased heart is likely to result in a disabling or fatal heart attack and the amount of exertion required may vary with the individual. *Bettendorf* v. *Kelly,* 229 Ark. 672, 317 S.W. 2d 708. It is unfortunate, therefore, that the precise and exact cause and extent of a disabling heart condition are difficult to determine short of heroic exploration or autopsy.

Ever since our decision in *Bryant Stave & Heading Co.* v. *White,* 227 Ark. 147, 296 S.W. 2d 436, there has been no requirement that a heart attack, to be compensable, must be caused, or brought on, by some unusual exertion rather than by the employee's regular work. *Rebsamen West* v. *Bailey,* 239 Ark. 1100, 396 S.W. 2d 822. See also *Reynolds Metals Co.* v. *Cash,* 239 Ark. 489, 390 S.W. 2d 100; *W. Shanhouse & Sons, Inc.* v. *Simms,* 224 Ark. 86, 272 S.W. 2d 68.

In *Reynolds Metals Co.* v. *Cain,* 243 Ark. 483, 420 S.W. 2d 872, we said:

"It is appellant's contention that appellee's attack was due to pre-existing arteriosclerotic disease, and his work had nothing to do with precipitating the attack. It is true that Cain was suffering from arteriosclerosis, and there is no dispute in the medical testimony on that point. The test, however, is whether the work that appellee was doing aggravated the pre-existing condition to the extent that it (the work) was a factor in bringing on the attack. *Reynolds Metals Company* v. *Robbins,* 231 Ark. 158, 328 S.W. 2d 489. Numerous cases hold in like manner."

In the case of *Asphalt Materials Co.* v. *Coleman,* 243 Ark. 646, 420 S.W. 2d 921, the question was whether or not there was any substantial evidence of a causal connection between the claimant's work and a heart attack, and in that case we said:

"In resolving the issue before us, we are mindful of those cardinal principles so well established as to need no citation of authority: (1) the compensation act is to be construed liberally in favor of the workman; (2) the burden is on the claimant to show causal connection between his heart attack and his employment; and (3) we give the evidence its strongest probative force in favor of the commission's findings because those conclusions carry the weight of a jury verdict."

In *Latimer* v. *Sevier County Farmer's Coop., Inc.,* 233 Ark. 762. 346 S.W. 2d 673, we said:

"In *U.S.F. & G. Co.* v. *Dorman,* 232 Ark. 749, 317 S.W. 2d 708, this court quoted from *Bettendorf* v. *Kelly,* 229 Ark. 672, 317 S.W. 2d 708, as follows: '. . . an accidental injury arises out of the employment when the required exertion producing the injury is too great for the person undertaking the work, whatever the degree of exertion or the condition of his health, provided the exertion is either the sole or a contributing cause of the injury. In short, an injury is accidental when either the cause or result is unexpected or accidental, although the work being done is usual or ordinary.' "

And in *Hall* v. *Pittman Construction Co.,* 235 Ark. 104, 357 S.W. 2d 263, we said:

"Under the substantial evidence rule that prevails in a case of this kind the appellant shoulders a heavy burden in seeking a reversal of the commission's decision upon an issue of fact. In order to succeed the appellant must show that the proof is so nearly undisputed that fair-minded men could not reach the conclusion arrived at by the commission. After studying the record we are unable to say that the appellant is entitled to a reversal; that is, that there is no substantial evidence to support the commission's findings."

There is no question from the medical evidence in this case, that Mr. Alford had an arteriosclerotic heart

condition for at least some period of time prior to his attack on September 13, 1971. Prior to that date, however, there is no evidence that his condition interfered with his regular duties as a truck driver and there is no evidence that he even knew he had the condition. There is little direct evidence as to the amount of stress and physical exertion involved in driving a truck-tractor trailer such as Mr. Alford was driving. It is clear from Dr. Kahn's testimony that the *basic underlying cause* of Mr. Alford's myocardial infarction was the inadequacy of blood supply to the heart muscles through arteries which were occluded, or nearly so, by nonoccupational arteriosclerosis, and this principal problem was unrelated to Mr. Alford's work. It is reasonable to assume that if Mr. Alford had been free of this basic underlying principal problem, his acute infarction would never have occurred and he would still be able to follow his occupation as a truck driver or engage in any other physical activity on an unlimited basis.

Turning now from the *"basic underlying cause"* and Mr. Alford's *"principal problem"* Dr. Kahn explains that a slight or temporary inadequacy of blood supply to the heart may result in warning chest pains known as angina pectoris when the individual exercises or exerts. He explains that a much greater inadequacy of blood supply may result in a myocardial infarction with permanent damage and he said that is what Mr. Alford had. "Inadequacy" is a relative term and Dr. Kahn readily agrees to the common sense proposition that physical exercise and exertion places a greater demand on the heart for its blood supply and while Dr. Kahn expressed the opinion that Mr. Alford's truck driving did not precipitate his heart attack or aggravate his heart condition, he limited Alford's activities to lifting not over five pounds in weight and said that had he had occasion to examine Mr. Alford prior to September 13, 1971, he would have placed him on lighter work than that of truck driving, and would have limited his activities to the same extent he did following the heart attack on September 13.

We are of the opinion that the Commission was justified in interpreting Dr. Bishop's letter-report as dif-

fering in opinion with Dr. Kahn as to whether or not the truck driving aggravated Mr. Alford's heart condition. Dr. Bishop's qualifications are not questioned in this case and he placed practically the same limitations on Mr. Alford's activities as did Dr. Kahn. Apparently both doctors would have recommended lighter work for Mr. Alford than that of truck driving had they had an opportunity to do so prior to September 13.

There is no evidence in the record as to how much either of the doctors knew about the exertion necessary in driving a truck-tractor rig through cities and on the highway, so it is reasonable to assume that Dr. Bishop knew as much about truck driving as did Dr. Kahn. Certainly Dr. Kahn, and apparently Dr. Bishop, would have recommended against attempting to drive the truck on September 13 had they had an opportunity to examine Mr. Alford before he made the trip. Dr. Bishop did not merely say that he presumed the truck driving aggravated Mr. Alford's condition, he said he *would have to* presume that the pre-existing condition was aggravated by driving the truck. Perhaps Dr. Bishop recognized, as Dr. Kahn apparently did, that Mr. Alford was in immediate danger of a myocardial infarction if and when additional demand was made on his diseased arteries and they only differ in the amount of exertion that would create such demand.

It is true that Dr. Bishop did not go into detail as to how he arrived at his opinion as did Dr. Kahn, but he was not asked to do so. Dr. Kahn does not say whether a myocardial infarction occurs over an extended period of time or suddenly. He does say that in his opinion Mr. Alford suffered an *acute* myocardial infarction. He explains that a myocardial infarction occurs for lack of blood supply through diseased arteries and the substance of his testimony is to the effect that anything, including exercise, which would increase the demand on the heart and arteries for blood supply, would likely result in insufficient blood oxygen to the heart muscles and result in a myocardial infarction.

From the overall evidence in this case, under the above rules we have announced in previous cases, we

are of the opinion that there is substantial evidence to support the Commission's finding in this case, and that the judgment of the trial court affirming the Commission must be affirmed.

Judgment affirmed.

FOGLEMAN, J., concurs.