## C. J. HORNER COMPANY and INDIANA LUMBERMEN'S MUTUAL INSURANCE COMPANY
*v.* Judith Tarvin STRINGFELLOW and
William Bryant STRINGFELLOW, Widow and
Dependent Son of William B. Stringfellow, Deceased

CA 84-355                    685 S.W.2d 533

### Court of Appeals of Arkansas
En Banc
Opinion delivered March 13, 1985

*Friday, Eldredge & Clark,* by: *Elizabeth J. Robben* and *Kevin A. Crass,* for appellants.

*William F. Magee,* for appellees.

DONALD L. CORBIN, Judge. On September 14, 1982, William B. Stringfellow, Sr., suffered a fatal myocardial infarction at his desk while employed by C. J. Horner Company, appellant. The Workers' Compensation Commission affirmed the Administrative Law Judge's opinion wherein Mr. Stringfellow's widow and dependent son received benefits on the basis that there was a causal connection between the deceased employee's job and death. We affirm.

On appeal, appellants contend that there is no substantial evidence to support the Commission's finding that the death of William B. Stringfellow, Sr., arose out of and in the course of his employment.

The record reflects that the decedent was employed as an office clerk by appellant C. J. Horner Company. At the time

of his death, he had been employed in this capacity for three and one half years. His supervisor testified that the decedent's duties consisted of being in charge of transposing orders for feed or concrete onto invoices and for taking down telephone orders. It was undisputed that the decedent's job did not involve any heavy physical activity. However, the job required long hours since the decedent was required to stay until the delivery men returned from their routes. The business was located in Hot Springs, Arkansas, and its busiest time of the year was during the racing season. The decedent's wage statements were introduced at the hearing reflecting that the decedent worked an average of 61.35 hours per week for the period beginning January 8, 1982, and ending September 10, 1982.

The decedent's supervisor testified that he did not notice anything unusual about the decedent on the day of his death nor had the decedent complained of being tired. The decedent's widow, appellee Judith T. Stringfellow, testified that her husband had appeared to be excessively tired in the months preceding his death. Appellee Judith Stringfellow also testified that her husband had not seen their family physician, Dr. William R. Mashburn, in over two years preceding his death. The decedent smoked approximately two packages of cigarettes daily and participated in a musical combo which played at night in clubs and private parties around Hot Springs. Appellee William B. Stringfellow, Jr., the decedent's son, testified to essentially the same facts.

The only medical evidence presented at the hearing was the deposition of Dr. Mashburn. He stated that he had been the decedent's physician since 1975 and that he had never treated the decedent for anything related to cardiac disease nor had he ever suspected the decedent to be suffering from cardiac disease. By the time Dr. Mashburn arrived at the hospital, the decedent had expired. Dr. Mashburn diagnosed the cause of death as acute myocardial infarction based upon his examination of the body and the report of the ambulance attendants. It was his understanding that on September 14, 1982, the decedent had been sitting at his desk performing his job and bent forward, laid his head down on the desk and

died. Dr. Mashburn wrote a letter to appellee Judith Stringfellow in which he stated that it was his feeling that the long hours and job pressures were contributing factors to the decedent's heart attack. In his letter to appellee, Dr. Mashburn stated as follows:

> I feel, without reservation, that the long hours, the job pressures of Mr. Stringfellow's employment were contributing factors to his heart attack, and could well have precipitated this event.

Dr. Mashburn testified that he learned of the decedent's long hours from appellee Judith Stringfellow although he was also aware of the type of business the decedent was engaged in. He had done business with appellant C. J. Horner Company and realized the hectic nature of the work. The following exchange occurred during the deposition of Dr. Mashburn.

> Q. Thank you. When you speak about job related stress, are you speaking about emotional or mental stress?
>
> A. I'm speaking of stress in any form. I'm also an industrial physician; I've been Union Carbide's physician here in Hot Springs at their Metal Division for some twenty-three years, and I do work for Bell Telephone and Kroger and other industrial people, and we find that stress, be it mental, imagined or be it physical, it tends to aggravate pre-existing conditions; it may accelerate them; and it may actually cause physical illness. All these are brought out by Dr. Cellia, the greatest doctor on stress, from Canada, and this is all well-documented.
>
> Q. Going back maybe one step further, it is my understanding that Mr. Stringfellow's job was a desk job — he answered the phone, he took orders and did billing work — and what I was asking was whether the stress that you are talking about — that you were even told about that Mr. Stringfellow was under — is it your understanding that it was more of a mental or emotional stress?

A. I'm not hedging on your question at all, but dealing with the public as I have all of my adult life, and having been a government worker and not being able to speak back as I can as a physician, I know that dealing with the public — if something is not right — it's the bookkeeper or the person that answers the phone that catches the wrath of the dissatisfied customer. When there has been a mistake made on the other end, that the delivery man made or the person who loaded it or the person that did anything else, it's the bookkeeper or the person in accounting that catches all the flak. And that in itself — my girl at the front desk complains of stress, and we're in a medical office and it's supposed to be a quiet business, and she complains of a great deal of stress. Believe me, working with the public — and even though you may feel sitting at a desk is sedentary and is not a stressful situation, some of your biggest stress can come at that desk, because you cannot say what's on your mind when a customer unloads on you. Horner still believes — I believe they still have this concept — that the customer is right, and so if you want to be an employee of Horner, you don't back-talk the customer and you just take the flak and lump it.

It is well settled that an award of benefits will be sustained by this Court where a myocardial infarction is shown to have been aggravated or precipitated by the employment. *Kempner's* v. *Hall*, 7 Ark. App. 181, 646 S.W.2d 31 (1983). There is no requirement in Arkansas that in order for a heart attack to be compensable, it must be caused or brought on by some unusual exertion rather than by the employee's regular work. *Hoerner Waldorf Corp.* v. *Alford*, 255 Ark. 431, 500 S.W.2d 758 (1973). In the case at bar, appellants contend that the above test, when viewed in connection with the liberal construction of compensability in favor of the claimant, has led to an approach which ignores the claimant's burden of proving a causal connection between the employment and the heart attack. We do not agree. Appellants also place much emphasis on the fact that the decedent's myocardial infarction occurred five months after the conclusion of the racing season in their

argument that there was no causal connection. We do not find this controlling.

Heart attack cases are admittedly within the most difficult area of workers' compensation law. While Dr. Mashburn could not state that the decedent's job caused his myocardial infarction, he did conclude without reservation that the decedent's long hours and the pressures of the job were contributing factors and could well have precipitated the myocardial infarction. The testimony of medical experts is an aid to the Commission in its duty to resolve issues of fact. It has a duty to use its expertise and experience in translating that testimony into findings of fact. *Bearden Lumber Co.* v. *Bond,* 7 Ark. App. 65, 644 S.W.2d 321 (1983). We review the evidence in workers' compensation cases in the light most favorable to the findings of the Commission. The issue is not whether we might have reached a different result or whether the evidence would have supported a contrary finding. The extent of our inquiry is to determine if the finding of the Commission is supported by substantial evidence. Even where a preponderance of the evidence might indicate a contrary result, we will affirm if reasonable minds could reach the Commission's conclusion. *Bankston* v. *Prime West Corp.,* 271 Ark. 727, 610 S.W.2d 586 (Ark. App. 1981).

From our review of the evidence, we cannot say that reasonable minds could not conclude that the decedent's employment was a precipitating factor which brought on this acute myocardial infarction of September 14, 1982.

Affirmed.

CRACRAFT, C.J., and CLONINGER, J., dissent.

LAWSON CLONINGER, Judge, dissenting. I respectfully dissent. The majority's decision will, I believe, establish a precedent that may have disastrous practical consequences in the future. In its attempt to prevent hardship in a particular case, the majority has, it seems to me, struck an unwitting blow at the very foundation of workers' compensation law.

The evidence upon which the Commission based its

finding that Mr. Stringfellow's employment was a precipitating factor in bringing on the fatal heart attack was a brief note to the widow from Dr. Mashburn, quoted in full in the majority opinion. Dr. Mashburn testified that he had been Mr. Stringfellow's physician since 1975 and (as the majority acknowledges in its opinion) had never, during those seven years, treated his patient for "anything related" to heart disease. Moreover, he admitted that he had neither discussed Mr. Stringfellow's duties with him nor observed Mr. Stringfellow at work, despite his business visits to the employer's office.

In his deposition, Dr. Mashburn conceded that job-related stress did not actually cause Mr. Stringfellow's death but was only one of several possible factors contributing to it. He also mentioned in this connection heavy smoking and fatigue, yet he could not determine which factor was decisive. It appears that the only information upon which the doctor based his one sentence opinion was Mrs. Stringfellow's assertion that her husband had worked long hours during the racing season. Of course, Oaklawn Park had been closed for five months when Mr. Stringfellow died.

Although we liberally construe the law of workers' compensation, resolving all doubtful cases in the claimant's favor, the claimant still bears the burden of establishing a compensable injury by a preponderance of the evidence. *Central Maloney, Inc.* v. *York,* 10 Ark. App. 254, 663 S.W.2d 196 (1984). I do not believe that a compensable injury had been established by appellees. The evidence ultimately shows nothing more than that Mr. Stringfellow died at work. If workers' compensation is to be anything other than general insurance, surely the Commission erred in awarding benefits in this instance. After considering the meager evidence presented to support appellees' claim, I cannot agree with the majority that reasonable minds could have arrived at the Commission's conclusion. *See Black* v. *Riverside Furniture Co.,* 6 Ark. App. 370, 642 S.W.2d 338 (1982). Under the circumstances, one may be forgiven for questioning the purpose of appellate review.

I am authorized to state that Chief Judge Cracraft joins me in this dissent.